IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
July 24, 2001 Session

## STATE OF TENNESSEE v. JODY SWEAT

**Appeal from the Circuit Court for Sevier County**
**No. 7308    Rex Henry Ogle, Judge**

**No. E2000-02472-CCA-R3-CD**
**September 26, 2001**

The defendant, Jody Sweat, indicted for attempted first degree murder and aggravated assault, was convicted of attempted second degree murder and aggravated assault. The trial court imposed concurrent sentences of 11 and four years, respectively. In this appeal of right, the defendant challenges the sufficiency of the evidence for attempted second degree murder; argues that the trial court improperly instructed the jury on attempted second degree murder as a lesser included offense; contends that the state was guilty of prosecutorial misconduct during closing argument; and submits that the jury was allowed to consider exhibits never offered into evidence. The judgments are affirmed.

**Tenn. R. App. P. 3; Judgments of the Trial Court Affirmed**

GARY R. WADE, P.J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Donald A. Bosch and Lisa B. Morton, Knoxville, Tennessee (on appeal), and Robert M. Cohen, Maryville, Tennessee (at trial), for the appellant, Jody Sweat.

Paul G. Summers, Attorney General & Reporter; Patricia C. Kussmann, Assistant Attorney General; and Steven R. Hawkins, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

In October of 1997, the victim, Donald Holden, was at his residence in Sevierville, drinking beer with friends. LeShea Firestine, who was celebrating her eighteenth birthday, and Jason Matthews were present. Later, the defendant, who knew Ms. Firestine, arrived at the residence. The victim, who had not previously met the defendant, offered him a 32-ounce beer. While the defendant accepted the drink, he complained that it "wasn't a real forty." The defendant commented that the red in the victim's Georgia Bulldogs outfit was a "dead color" that "wouldn't fly with his people . . . in Knoxville," who were in the Crip gang. Later, when they moved to the front porch of the

residence, the defendant referred to the victim as a "slob." At that point, the victim ordered the defendant to leave and, when the defendant refused, struck him with a beer bottle. The two fought in the front yard and Matthews joined in the fray in an effort to assist the victim. The defendant, who was bested in the altercation, left angrily and warned that he would be back to kill the victim. The defendant then "peeled out" in his truck and, according to the victim, drove through the neighborhood "screaming that he'd be back to shoot up my house and kill me." Afterward, the victim called his parents, who were away, and informed them of the incident. Fearing for his safety, the victim left his residence and rented a motel room for the night. The victim did not contact authorities.

Approximately one week later, the victim was in the upstairs living room of his split-level house watching television. The victim's mother, Diana Herrick, and his stepfather, Wesley Herrick, were downstairs in a studio/music room. The lights were on in both rooms, each of which faced the street. Mr. Herrick testified that the windows on the front of the house would have allowed a passerby to see silhouettes inside the house at night. There were, however, trees in the yard. Cars were parked in the driveway. The victim described what occurred thereafter as follows:

> [A]ll of a sudden it sounded like firecrackers at my feet. And videotapes were popping up beside me. And as I stood up I noticed a big puff of the sheetrock . . . and I just dropped to the ground. Right then I knew it was gunshots, somebody shot at the house. . . . [M]y dad was yelling to make sure I was okay. Immediately I called the authorities.

One shot, fired through an office area, traveled through a filing cabinet, a desk, and a wall before lodging in a bedroom wall. Another shot was fired through the front door, which was flanked by large windows. Two shots were fired into the room that the victim occupied, one of which "landed between [the victim's] feet" and the other of which traveled "above [his] head." Another shot was fired through a downstairs window, missing the victim's stepfather by seven or eight inches.

When he arrived at the scene, Investigator Doug Shanks of the Sevierville Police Department found six bullet casings in the roadway in front of the house and six holes in the exterior of the house. Officer Shanks was able to find three of the six bullets fired into the residence. While one bullet was too damaged to identify, an examiner with the Federal Bureau of Alcohol, Tobacco & Firearms was able to determine that the other two bullets had been fired from a weapon which belonged to the defendant's father, Frank Sweat. The six casings in the street had been ejected from the same weapon. According to Officer Shanks, the bullets had an upward trajectory to the victim's house, which was elevated from street level.

When questioned by police, the defendant acknowledged having fired the gun while driving by the victim's residence. He claimed, however, that he had not aimed at the house and had instead fired the shots into the air in an effort to frighten the victim. Officer Shanks described the residence as elevated above the roadway and about 75 to 100 feet from where the shots were fired.

Ms. Firestine, who was a witness for the state, testified that two or three days after the fight, the defendant telephoned her and warned her to stay away from the victim's residence, explaining that he intended to fire shots at the residence. Ms. Firestine heeded his warning and did not return to the victim's residence.

The defendant, 20 years old at the time of the shooting, testified in his own defense. He acknowledged that he had engaged in an argument with the victim and claimed that he was about to leave when he was struck in the back of the head. The defendant claimed that he fell to the ground where he was kicked by the victim and by Matthews. While denying that he had threatened to kill the victim, the defendant did acknowledge saying that he would return "to kick his butt." The defendant admitted that after a visit to Pigeon Forge on the night of October 13, he returned to the victim's residence at approximately 11:30 P.M., driving a truck that he had borrowed from his father, Frank Sweat. The defendant, who claimed that he was intoxicated after drinking beer most of the afternoon and evening, was in the truck with a friend, Ryan Stiles. The defendant explained the course of events as follows:

> I was coming down [the] Parkway . . . and I got down to where South Boulevard cuts off and I was intoxicated and I wasn't thinking, it was stupid, and I just felt under the seat because sometimes my dad carries a pistol. And I was just curious to see if it was there and it was there and I just, it was stupid of me, I just drove by and just stuck the gun out the window in the air and just started pulling the trigger. . . .

The defendant claimed that he "didn't notice anything," such as cars in the driveway or lights in the interior of the house, before firing the shots.

Frank Sweat testified that he did not normally leave his pistol in the truck. He described the defendant as intoxicated when he returned to the Sweat residence that night. Upon checking his truck, Sweat observed that the right front tire was flat and the right front fender was damaged. He also discovered that his pistol's clip, which normally contained six bullets, was empty. When Sweat talked to the defendant on the following morning, the defendant claimed that he could not remember what had happened. Sweat explained, "I never could get a straight story out of him as to what really did happen the night before." On cross-examination, Sweat acknowledged that the pistol functioned properly. When asked whether the weapon shot straight, Sweat answered, "Yes, it shoots pretty good."

I

The defendant first asserts that the evidence was insufficient to support a conviction of attempted second degree murder. He argues that the conviction was based largely upon circumstantial evidence and that the state failed to establish that he was aware that the house was occupied at the time the shots were fired.

Second degree murder is defined as the knowing killing of another. Tenn. Code Ann. § 39-13-210. A knowing killing is one wherein a "person . . . acts knowingly with respect to the conduct or to circumstances surrounding the conduct [resulting in death] when the person is aware of the nature of the conduct or that the circumstances exist." Tenn. Code Ann. § 39-11-106(20). A criminal attempt, as defined by Tennessee Code Annotated § 39-12-101, is committed when a person, "acting with the kind of culpability otherwise required for the offense," either (1) "[i]ntentionally engages in action or causes a result that would constitute [the] offense if the circumstances surrounding the conduct were as the person believes them to be"; or (2) "[a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on [his] part"; or "[a]cts with intent to complete a cause of action or cause a result that would constitute the offense, under the circumstances . . . as [he] believes them to be, and the conduct constitutes a substantial step toward the offense." Tenn. Code Ann. § 39-12-101(a).

On appeal, the state is entitled to the strongest legitimate view of the evidence and all inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the evidence are matters entrusted exclusively to the jury as the trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). The relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). This court may neither reweigh nor reevaluate the evidence; nor may this court substitute its inferences for those drawn by the trier of fact. Liakas v. State, 199 Tenn. 298, 286 S.W.2d 856, 859 (1956). The evidence is sufficient when a rational trier of fact could conclude that the defendant is guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). The defendant has the burden of demonstrating that the evidence is not sufficient when there is a challenge to the sufficiency of the evidence. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

An offense may be proven by circumstantial evidence alone. Price v. State, 589 S.W.2d 929, 931 (Tenn. Crim. App. 1979). Our scope of review is the same when the conviction is based upon circumstantial evidence as it is when it is based upon direct evidence. State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 208 Tenn. 75, 343 S.W.2d 895, 897 (1961).

Where the evidence is entirely circumstantial, the jury must find that the proof is not only consistent with the guilt of the accused but inconsistent with his innocence. There must be an evidentiary basis upon which the jury can exclude every other reasonable theory or hypothesis except that of guilt. Pruitt v. State, 3 Tenn. Crim. App. 256, 460 S.W.2d 385, 390 (1970). Like all other fact questions, the determination of whether all reasonable theories or hypotheses are excluded by the evidence is primarily a jury question. State v. Tharpe, 726 S.W.2d 896, 900 (Tenn. 1987); Marable v. State, 203 Tenn. 440, 313 S.W.2d 451, 457 (1958).

In support of his claim that the evidence is insufficient to establish that he "shot into [the victim's residence] with the intent to knowingly kill those inside," the defendant has cited State v.

Wilson, 924 S.W.2d 648 (Tenn. 1996).  In Wilson, our supreme court held that the evidence was insufficient to support an aggravated assault conviction when the state proved that the defendant fired two shots into a residence only two days after having had an angry, verbal confrontation with the owner.  The basis for the ruling was that there was no evidence that the defendant knew that the house was occupied and, therefore, no basis for a finding that the defendant acted knowingly or intentionally in causing the victims to reasonably fear imminent bodily injury.  Id. at 651.  In Wilson, the shots were fired at 3:00 P.M.  While the owner was not present at the time of the shooting, his brother, a cousin, and three others were inside the residence.

In our view, our supreme court's holding in Wilson can be distinguished from this case on the facts.  As indicated, the evidence was insufficient in Wilson because the state was unable to prove, circumstantially or otherwise, that the defendant knew  that people were inside the residence at the time the shots were fired.  In this instance, however, there was ample evidence to support a finding by reasonable jury that the defendant knew the victim's residence to be occupied at the time of the shooting.  The proof established that the defendant warned the victim that he would return to kill him.  Some two or three days before the shooting, the defendant notified Ms. Firestine that he intended to shoot into the residence and warned her to stay away in order to avoid harm.  One week after the initial altercation, shots were fired into the victim's residence between 11:30 and 11:45 P.M., not during mid-afternoon as in Wilson.  Unlike the circumstances in Wilson, the vehicles parked in the victim's driveway were visible from where the shots were fired.  Here, the proof established that interior lights illuminated both levels of the house.  There was testimony that several windows were visible from the road.  The victim's stepfather testified that immediately prior to the shooting, the light behind him was turned on, and he had stepped very close to the window.  It was his experience that at night, a silhouette in the window was visible from the roadway when the interior lights were illuminated.  Having stood up to adjust the sound on a recording device, the victim's stepfather had just stepped back as a bullet penetrated the window and traveled within seven or eight inches of his body.  Several shots struck areas near the victim, who was upstairs.  Three of the six bullets were fired into the two rooms that were occupied and lighted.  The jury also had a basis upon which to discredit parts or all of the defendant's testimony:  He claimed to have been intoxicated at the time of the shooting and was later uncooperative when asked to identify the other person in his truck.

In our assessment, the evidence was sufficient to establish that the defendant knowingly attempted to commit the crime of second degree murder.  Because the circumstances were sufficient to establish that the defendant knew the victim's house was occupied and that he intended to inflict harm, the ruling in Wilson would not control.

II

Next, the defendant, indicted for attempted first degree murder, contends that the trial court improperly instructed the jury on the lesser included offense of attempted second degree murder.  He argues that the record does not contain any evidence to support the lesser charge.  This argument is effectively foreclosed, however, by our holding that the evidence was sufficient to support the

defendant's attempted second degree murder conviction. The defendant also contends that if the culpability required for a criminal attempt is "intentional," that degree of culpability would preclude any instruction on attempted second degree murder, which merely requires the culpable mental state of "knowingly." In support, he cites State v. Kimbrough, 924 S.W.2d 888, 892 (Tenn. 1996), wherein our supreme court reversed a conviction for attempted felony murder because a person cannot "intend to accomplish the unintended."

In every criminal prosecution, the accused has the right to "an impartial jury." Tenn. Const. art. I, § 9. The jury has the "right to determine the law and the facts, under the direction of the court." Tenn. Const. art. I, § 19. The trial judge has a duty to give a complete charge of the law applicable to the facts of the case. State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986). There is an obligation "to charge the jury as to all of the law of each offense included in the indictment, without any request on the part of the defendant to do so." Tenn. Code Ann. § 40-18-110(a). Complete instructions allow the jury to determine among each alternative the appropriate offense, if any, for conviction and to more evenly balance the rights of the defendant and the state. It is only when the record is devoid of evidence to support an inference of guilt of the lesser offense that the trial court is relieved of the responsibility to charge the lesser crime. State v. Stephenson, 878 S.W.2d 530, 549 (Tenn. 1999); State v. Boyd, 797 S.W.2d 589, 593 (Tenn. 1990).

In State v. Bolden, 979 S.W.2d 587 (Tenn. 1998), the defendant, who was charged with premeditated first degree murder, was willing to gamble on an "all or nothing" verdict by asking the trial judge not to charge the lesser included offense of second degree murder; the trial judge refused and the defendant was convicted of that lesser crime. While our supreme court affirmed the conviction, its opinion emphasized the mandate of the statute requiring trial courts to "instruct the jury on all lesser offenses if the evidence introduced at trial is legally sufficient to support a conviction for the lesser offense." Id. at 593. Our supreme court also acknowledged that a "purpose of the statute is to protect the right to trial by jury by instructing the jury on the elements of all offenses embraced by the indictment . . . [and to] facilitate[] the overall truth-seeking function of the process." Id.

In State v. Ely, our supreme court confirmed that the failure to charge a lesser included offense qualifies as an error of constitutional proportions:

> [T]he right of trial by jury is of constitutional dimension [as] evidenced by its embodiment in Article I, section 6 of the Tennessee Constitution, which states, "the right of trial by jury shall remain inviolate." Accordingly, we hold that this constitutional right is violated when the jury is not permitted to consider all offenses supported by the evidence.

Ely, 48 S.W.3d 710, 727 (Tenn. 2001) (emphasis in original).

Initially, we observe that although the defendant has couched his argument in terms of whether the trial court's instructions to the jury were proper, his true contention appears to be that

attempted second degree murder is not a crime in Tennessee. In State v. Palmer, 10 S.W.3d 638, 644 (Tenn. Crim. App. 1999), however, this court rejected that position, holding that "an attempt to commit second degree murder is a criminal offense in Tennessee." Recently, our supreme court confirmed that holding in State v. Mateyko:

> [R]esult-of-conduct offenses otherwise requiring a non-intentional mental state may be attempted even if the defendant did not consciously desire for the proscribed result to occur. Taking second degree murder as one such example, it is clear that the defendant does not have to "intend" that death occur, at least not in the sense that the victim's death is the defendant's conscious objective or desire. Instead, so long as the [s]tate shows that the defendant believed that death would follow from his or her conduct, criminal attempt liability may be imposed. . . .

___ S.W. 3d___, ___ n.6 (Tenn. 2001), No. M1998-00275-SC-R11-CD, slip op. at 11 (emphasis in original).

Second degree murder is defined as the knowing killing of another. Tenn. Code Ann. § 39-13-210(a). Criminal attempt requires proof of two material elements: (1) the culpability required for the attempted crime; and (2) an act in furtherance of the attempted crime. Tenn. Code Ann. § 39-12-101(a); Wyatt v. State, 24 S.W.3d 319, 323 (Tenn. 2000). A person commits attempted second degree murder when he or she intentionally engages in conduct that would, if complete, result in the knowing killing of another. State v. Palmer, 10 S.W.3d 638, 645 (Tenn. Crim. App. 2000). Attempted second degree murder is a lesser included offense of attempted first degree murder. See State v. Reginald Merriweather, No. W1999-02050-CCA-R3-CD (Tenn. Crim. App., at Jackson, Mar. 6, 2001).

In the charge to the jury in this case, the trial court stated as follows:

> Any person who attempts to commit a criminal offense is guilty of a crime.
> For you to find a person guilty of [c]riminal [a]ttempt, the [s]tate must have proven beyond a reasonable doubt the existence of the following essential elements:
> (1) that the defendant intended to commit the specific offense of . . . [s]econd [d]egree [m]urder; and
> (2)(a) that the defendant did some act or caused something to happen that would have constituted . . . [s]econd [d]egree [m]urder if the defendant's beliefs at the time he acted had in fact been true; or
> (b) that the defendant did some act intending to cause an essential element of . . . [s]econd [d]egree [m]urder to occur, and at the time believed the act would cause the element to occur without further action on his part.
>       *      *      *
> Second [d]egree [m]urder is defined as the following: The [s]tate must prove beyond a reasonable doubt
> (1) that the defendant unlawfully killed the alleged victim; and

(2) that the defendant acted knowingly.

"Knowingly" means a person acts knowingly with respect to their conduct or to circumstances surrounding their conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of their conduct if the person is aware that their conduct is reasonably certain to cause the result.

The requirement of "knowingly" is also established if it is shown a defendant acted intentionally.

The instruction was based on T.P.I. – Crim. 4.01 (4th ed. 1995).

Recently, in State v. Mark Williams, No. W1999-01456-CCA-R3-CD, slip op. at 6 (Tenn. Crim. App., at Jackson, Oct. 24, 2000) (citations omitted), this court approved of a substantially equivalent attempted second degree murder instruction in the face of a similar challenge:

In State v. Eldridge, . . . this court specifically approved the language of T.P.I. – Crim. 4.01 (4th ed. 1995) in the context of an attempted second degree murder charge. More recently, in State v. Palmer, a panel of this court addressed an identical challenge to an attempted second degree murder instruction based on T.P.I. Crim – 4.01. The court found no error in the charge:

Because the trial court specifically charged that the jury must find that the defendant intended to commit second degree murder, we hold that the instruction was proper. The trial court's further instruction that second degree murder requires that the defendant act knowingly does not detract from the accuracy of this omission.

Palmer, 10 S.W.3d at 645.

In our view, the ruling in Palmer controls. The charge required the jury to find that the defendant intended to commit second degree murder and that the defendant completed some act intended to ultimately result in second degree murder. This was a proper instruction. See State v. Craig Bryant, No. 02C01-9707-CR-00286 (Tenn. Crim. App., at Jackson, Jan. 8, 1999) (holding that there was no error in attempted second degree murder instruction based on T.P.I.Crim.--4.01 (4th ed.1995)); State v. David Allen Vaughn, No. W1999-01647-CCA-R3-CD (Tenn. Crim. App., at Jackson, Dec. 27, 1999) (holding that trial court properly instructed the jury on attempted second degree murder pursuant to T.P.I.Crim.--4.01 (4th ed.1995) and denied the defendant's request for a special instruction requiring a finding of a specific intent to "kill").

In our view, the trial court correctly charged the jury on the lesser included offense of attempted second degree murder. To have done otherwise would have qualified as a constitutional violation. The instructions required the jury to find that the defendant intended to commit second degree murder. The holdings in State v. Palmer and State v. Mark Williams control in this instance.

## III

Next, the defendant submits that during closing argument, the assistant district attorney general improperly stated the law on the issue of mens rea, improperly expressed his personal opinion of the evidence, improperly challenged the defense personally, and argued facts outside of the recorded proof.

Presented as an issue for our review is the following argument made on behalf of the state:

He waited and I don't know if he stayed and waited until the cars pulled in the driveway and they were in the house. We don't know that and I can't prove that.

In his summation to the jury, the assistant district attorney general also provided the jury with two examples of reckless conduct: driving too fast and failing to require a child to use a seat belt. He questioned the validity of the defense as follows: "If he's shooting up in the air how could it have gone through a window down there next to the ground? Explain that to me." Finally, the assistant district attorney compared the reputation of Wesley Herrick, the victim's stepfather, who was a witness for the state, with that of the defendant:

[Herrick's] reputation and character is impeached here today and he told you like it is. . . . This defendant's a liar. Besides that, he's somebody that brought his violence from Knoxville, Tennessee, over to Sevier County.

Initially, there was an objection when the prosecution argued that excessive speeding and failing to restrain a child in a car are examples of reckless endangerment. In response to the objection by the defense, the trial court commented, "Folks, this is argument."

In our view, the assistant district attorney general did not misstate or mischaracterize the law defining the culpable mental state for recklessness. Recklessness may exist when one is "aware of but consciously disregards" a substantial and unjustifiable risk. Tenn. Code Ann. § 39-11-302(c). The defendant argued that he was guilty of mere recklessness, not intentional or knowing conduct. While instructions in the law are typically reserved for the trial judge, arguments about application of the law to the facts are permissible. The record does not demonstrate that this argument was improper.

There were no other contemporaneous objections made to the state's final argument. While the defendant complained in his motion for new trial that the argument on behalf of the state included improper references to the child endangerment statute and an improper challenge to the defense, none of the other instances of alleged prosecutorial misconduct were addressed. Typically, these omissions would result in a waiver of the issue. See State v. Green, 947 S.W.2d 186, 188 (Tenn. Crim. App. 1997).

The "challenge" made during the final closing on behalf of the state, "Explain that to me," appears in proper context to be rhetorical in nature. The paragraph in which the reference was made includes the following argument:

> And he wants to talk about the living room that's in the upstairs, but he doesn't want to mention the basement where the silhouette was. If he's shooting up in the air how could it have gone through a window down there next to the ground? Explain that to me. There wasn't anything said about that. A man shooting up in the air and it goes in a window down by the ground and barely misses Mr. Herrick.

The state has every right to question the veracity of the defendant's claims so long as it is in conjunction with evidence appearing in the record and the reasonable inferences which might be drawn therefrom. Thus, this question or comment did not qualify as erroneous.

In support of his other allegations of prosecutorial misconduct by reference to facts not in evidence, the defendant has quoted from the American Bar Association Standards Relating to the Prosecution Function, Approved Draft (1971):

> 5.8 **Argument to the jury.**
> (a) The prosecutor may argue all reasonable inferences from evidence in the record. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.
> (b) It is unprofessional conduct for the prosecutor to express his personal belief or opinion as [to] the truth or falsity of any testimony or evidence or the guilt of the defendant.
> * * *
> 5.9 **Facts outside the record.**
> It is unprofessional conduct for the prosecutor intentionally to refer to or argue on the basis of facts outside the record whether at trial or on appeal, unless such facts are matters of common public knowledge based on ordinary human experience or matters of which the court may take judicial notice.

The defendant asserts that speculation as to whether the defendant waited for the victims to return to their residence, calling the defendant a "liar," and suggesting a prevalence of violence in the defendant's county of residence was improper. In Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976), this court established five factors to be considered in determining whether alleged instances of prosecutorial misconduct might have affected the verdict to the prejudice of the defendant:

> (1) the conduct complained of in context and in light of the facts and circumstances of the case;
> (2) the curative measures undertaken by the court and the prosecution;
> (3) the intent of the prosecutor in making the improper statements;

(4) the cumulative effect of the improper conduct and any other errors in the record; and
(5) the relative strength or weakness of the case.

Certainly, the state should not speculate or argue facts which are not in the record, although the assistant district attorney candidly acknowledged that he had engaged in speculation in making the argument. Yet, reasonable inferences are permissible and a fine line often separates the two classifications. Here, the argument most likely fell into the speculation category. Moreover, it is rarely to the benefit or to the dignity of the state to characterize the defendant as "a liar," even if the proof supports such a conclusion. Further, it adds little credibility to the state's position to suggest that the defendant is more culpable because he is a Knox County resident. Encouraging prejudice by a jury in one county towards a defendant from another would qualify as inappropriate argument. Nevertheless, the conduct of the assistant district attorney general would not serve as a ground for reversal in this instance. In context, the conduct complained of was relatively benign and, while the trial court did not undertake any curative measures, there is little indication that the assistant district attorney general intended to improperly prejudice the defense. Finally, the state had a particularly strong case. The effect of the imprudent argument was insignificant and there are no errors apparent from our review of the record.

IV

As his final argument, the defendant complains that the state was allowed to introduce various exhibits absent a proper foundation for their introduction. Included among those items at issue are the bullet casings found in the roadway in front of the victim's residence, certain photographs, and the statement made by the defendant to the police. The defendant claims that these items were merely identified and never admitted as part of the state's proof in chief.

The photographs of the house were introduced by the defense as Exhibits 1 and 2. The remaining exhibits were introduced during the testimony offered by Officer Shanks. In each instance, the state asked that the evidence be filed as an exhibit to which the trial court either remarked, "So ordered," or made no remark at all. In support of his argument, the defendant cites Rule 30.1 of the Tennessee Rules of Criminal Procedure:

> Upon retiring to consider its verdict, the jury shall take to the jury room all exhibits and writings which have been received in evidence, except depositions, for their examination during deliberations, unless the court for good cause, determines that an exhibit should not be taken to the jury room.

Because the state failed to place the exhibits "into evidence," the defendant argues that the trial court erred by allowing the jury to consider the items questioned.

The issue has been waived. The defense failed to make a contemporaneous objection at the time the state submitted the items at issue. See Tenn. R. Evid. 103(a)(1); State v. Richard Allen Kidd II, No.03C01-9607-CC-00272, slip op. at 4-5 (Tenn. Crim. App., at Knoxville, Dec. 23, 1997).

-11-

Furthermore, even if the state had failed to properly submit the items at issue as evidence, there was overwhelming proof, including the testimony of the defendant, that he had fired the shots. There was also testimony from the occupants of the residence as to the proximity of the shots. The police investigation confirmed the damage to the residence and many other facts which led to the prosecution. Thus, any failure to specifically admit the exhibits as evidence was harmless. Tenn. R. Crim. P. 52(a).

As indicated in the Kidd opinion, authored by Judge James Curwood Witt, Jr., the proper procedure for the admission of exhibits is as follows:

> An attorney who wants to introduce an exhibit at trial should (a) ask the court reporter or other court officer to mark the exhibit for identification (exhibits should be marked numerically and sequentially without reference to the proponent); (b) show the exhibit to adversary counsel (this should be reflected in the record), thereby giving him the opportunity to raise objections before foundation questions and answers suggest inadmissible matter; (c) either obtain the court's permission to approach the witness to deliver the exhibit for his inspection, or, if required by court rule, ask that a court official present the exhibit to the witness; (d) lay the proper foundation for the admission of the exhibit, including proof of authenticity (in doing so, leading questions are appropriate because laying a foundation is a preliminary matter); and (e) then request that the exhibit be introduced into evidence. If the request for admission is for limited purposes, this should be stated in the request.

Kidd, slip op. at 6 (quoting Lawrence A. Pivnick, Tennessee Circuit Court Practice § 24-12 (4th ed. 1995)).

In Kidd, the record reflected a casual approach toward the admission of exhibits. While the items offered were authenticated by the witness, the state never asked for permission to place the exhibits into evidence. The defendant offered no objection to the procedure initially and, when the defendant finally made an objection, the trial court denied relief, indicating that submission of the exhibits to the jury was tantamount to the approval of the exhibits as evidence. Similarly, there was no objection made by the defendant in this case and no issue raised about the propriety of the evidence. In our view, the defendant acquiesced to the submission of the items in question.

Accordingly, the judgment is affirmed.

_____
GARY R. WADE, PRESIDING JUDGE

-12-